2024 UT App 66

# THE UTAH COURT OF APPEALS

AVERTEST, LLC,
Petitioner,

*v.*

PROCUREMENT POLICY BOARD, DEPARTMENT OF HUMAN SERVICES,
DIVISION OF CHILD AND FAMILY SERVICES, SHAD BRUNSON,
SPENCER HALL, MARK ANDERSON, ALISON MCCOY, AND
CHRISTOPHER JENNINGS,
Respondents.

Opinion
No. 20220388-CA
Filed May 9, 2024

Original Proceeding in this Court

Walter A. Romney Jr., Trenton L. Lowe, and
E. Barney Gesas, Attorneys for Petitioner

Sean D. Reyes, Stephen W. Geary, and Erin T.
Middleton, Attorneys for Respondents Procurement
Policy Board, Department of Human Services, and
Division of Child and Family Services.

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 For several years, Avertest, LLC, dba Averhealth (Avertest) provided drug and alcohol testing services to clients of the Utah Division of Child and Family Services (DCFS), a division within the Utah Department of Human Services (the Department). When the Department solicited bidders in 2021 to provide these services under a new contract, Avertest submitted a bid, but its proposal was rejected as non-responsive. Avertest unsuccessfully protested the decision first to a protest officer (Officer) and then to the Utah Procurement Policy Board (the

Board), each of which rejected Avertest's arguments. Avertest now seeks judicial review of the Board's decision, and after review, we decline to disturb it.

BACKGROUND

¶2     In late 2021, the Department issued a request for proposals (the RFP) to enter into a five-year contract with a single service provider to provide drug and alcohol testing services to DCFS clients.

*The RFP Requirements and Process*

¶3     The RFP process consisted of three mandatory stages of evaluation for all applicants: an initial review, a technical proposal evaluation, and a final cost proposal evaluation.

¶4     The initial review stage set a threshold six "mandatory minimum requirements" for continuing to the technical proposal evaluation stage. If a proposal met the initial review requirements, the proposal would then be evaluated on five technical criteria: (1) the number of collection sites included in the proposal, (2) the hours of operation proposed at these sites, (3) the turn-around time for test results, (4) the availability of qualified staff to testify in court proceedings, and (5) the organization's LGBTQ+ policy related to observing sample collection. These five technical criteria were scored by independent evaluators, whose scores were averaged and then multiplied by each criteria's assigned "weight" to create a total score for each proposal out of 85 possible points. A proposal needed to score a minimum of 51 points to proceed to the final cost proposal evaluation stage.

¶5     Four service providers submitted proposals in response to the RFP. Of these proposals, only three survived the initial review stage by meeting the minimum qualifications to be further

considered under the technical proposal evaluation: Avertest, the incumbent provider since 2018; Beechtree Diagnostics, LLP (Beechtree); and Physician Services, Inc. (PSI).

¶6    The proposals submitted by Avertest, Beechtree, and PSI were then each evaluated and scored on the five technical criteria. While both Beechtree and PSI received total scores above the 51-point threshold (60.5 and 65.8, respectively), Avertest received a total score of 50.25—having received the lowest score among the proposals for multiple criteria—and was not allowed to proceed to the final cost proposal evaluation stage. In the final stage of the RFP process, Beechtree received a superior rating for cost effectiveness when compared to PSI and was thus awarded the contract.

¶7    Following the award of the DCFS contract to Beechtree, Avertest formally protested the evaluation committee's decision to Officer, alleging that the scoring process failed to comply with the RFP requirements and incorrectly scored the technical criteria. *See generally* Utah Code § 63G-6a-1602(4)(b) ("A protest may not be considered unless it contains facts and evidence that, if true, would establish . . . the procurement unit's failure to follow a provision of a solicitation . . . [or] a failure to correctly apply or calculate a scoring criterion."). Specifically, Avertest argued that it received an inappropriately low technical score because of the evaluation committee's failure to follow the RFP scoring rubric and that this failure to correctly score Avertest's proposal caused it to be wrongly excluded from the final cost proposal evaluation stage of the RFP process.

¶8    After reviewing Avertest's protest, Officer issued a notice of decision (the Protest Decision) denying Avertest's protest and determining that each of Avertest's contentions was unpersuasive. As set forth below, the Protest Decision explained in detail why each of Avertest's arguments failed.

*First Criteria*

¶9      "The first technical criteria in the RFP [was]: 'Number of collection sites meeting [scope of work] criteria and the ability to cover the required geographical areas. Higher scores will be given to vendors with more locations.'" Avertest received a lower score on this criteria than Beechtree, as Avertest proposed ten fewer collection sites than Beechtree. Avertest protested the lower score, alleging five reasons its proposal should have been scored more favorably:

> (1) "the evaluation committee should have performed due diligence into the winning proposal's sites,"
>
> (2) "two of the collection sites in the winning proposal are not operational,"
>
> (3) "three of the sites listed by the winning proposal 'appear[ed] to be located at private residences,'"
>
> (4) the winning proposal made "misrepresentations," and
>
> (5) "all [but one] of the sites listed in the winning proposal . . . are operated by other entities."

¶10     Officer addressed each of Avertest's challenges regarding the number of collection sites score, explaining that:

> (1) "[t]here is no requirement in the Procurement Code, associated administrative rules, or the RFP that an evaluation committee must investigate each claim a vendor makes in a proposal" but instead, such is "at the discretion of the evaluation committee";
>
> (2) vendors were not prohibited from including future sites in their proposals, and in fact it "is common practice" for offerors to make proposals that include future facilities, as

requiring them to "obtain facilities prior to a contract award would stifle competition";

(3) "[n]either the RFP nor the scope of work prohibit private residences" from being listed as collection sites, and even if "private residences [were] not acceptable" in the past, Utah Code section 63G-6a-707(4) prohibits committee members "from evaluating proposals with criteria not described in the RFP";

(4) "each proposal is scored against the evaluation criteria, not against other proposals" and even if the committee were to have disqualified five of Beechtree's locations, it would still have more locations than Avertest; and

(5) even if it was true that all but one of Beechtree's proposed sites were operated by other entities, "this has no bearing on [Avertest's] score and does not remedy [Avertest's] failure to achieve the minimum score threshold."

*Second Criteria*

¶11    "The second technical criteria in the RFP [was]: 'Hours of operation. Higher scores will be given to proposals with the greatest availability of hours including early morning and late night hours.'" Avertest and Beechtree received the same score on this criteria. Avertest protested this score, alleging three separate reasons its proposal should have been scored more favorably, namely:

(1) "its proposal [was] 'inexplicably scored lower' than the winning proposal,"

(2) "its proposal should have received a score higher . . . due to its hours of operations," and

(3) "the evaluation committee cannot give weight to a statement in the winning proposal that hours 'can be adjusted as needed.'"

¶12   Officer addressed each of Avertest's challenges regarding the hours-of-operation score, explaining:

(1) Avertest wrongly "assume[d] that it received a lower score than the winning proposal on this criteria. . . . [Avertest] has not submitted a GRAMA request for the detailed score sheets . . . . Had [Avertest] . . . requested the detailed score sheets, it would have learned that its proposal received the same score as the winning vendor's proposal for this category";

(2) "[f]or subjective criteria, there is no formula that dictates how an evaluation committee member must weigh the information in a proposal. . . . There are a multitude of rational reasons an evaluator might have scored the way they scored, including for example, lack of early morning hours at key sites, lack of late hours at key sites, and a limited number of sites. . . . It is noted that no proposals scored [higher than Avertest] for this criteria"; and

(3) "[t]here is no law nor requirement of the RFP that would prohibit evaluation committee members from giving weight to such an assertion made in a proposal. . . . Evaluation committee members have the duty and discretion to weigh all statements in a proposal and score accordingly."

*Fourth Criteria*[1]

¶13 "The fourth technical criteria in the RFP [was]: 'Qualified staff available to testify in court. Higher scores will be given to staff availability with higher qualifications.'" Avertest scored lower than Beechtree on this criteria. Avertest's proposal identified only two staff members available to testify, along with their qualifications, and Avertest did not list the qualifications of its area managers. Avertest protested this score, arguing its proposal should have been scored more favorably because Avertest's "staff who are available to testify in court are more highly qualified than the staff identified in the winning proposal."

¶14 Officer addressed Avertest's challenge to the qualified staff score it received, explaining:

> [Avertest's] proposal does not list the qualifications of the area managers. . . . Like the other subjective evaluation criteria, the evaluation committee members have discretion as to how to weigh information in proposals. There are many reasons why an evaluator may have scored the way they scored. The lack of credentials for the area managers alone would provide a rational basis for [the score received].

*Fifth Criteria*

¶15 "The fifth technical criteria in the RFP [was]: 'Policy related to LGBTQ+ observed collection. Higher scores will be given to trauma-informed policies.'" Avertest challenged its score on this criteria, wrongly assuming that Beechtree received a higher score and arguing Avertest's proposal should have been scored more favorably: "[Avertest] was penalized for its policy that is in no

---

1. Avertest's protest contained no complaints with the scoring of the third criteria, we therefore move directly to the fourth criteria.

way inferior to that proffered by Beechtree, which presumably received a higher score based on their overall 10.2-point increase over [Avertest's] overall score." In reality, Avertest scored higher than Beechtree did on this criteria. Officer addressed Avertest's challenge to its LGBTQ+ policy score, explaining why it could have received a lower score than it desired, despite scoring higher than Beechtree did:

> Utah Administrative Code R33-7-705(1)(a) states: "Evaluators are required to exercise independent judgment in a manner that is not dependent on anyone else's opinions or wishes." [Avertest's] entire policy for this criteria was 182 words, roughly 1/2 page (the highest scoring proposal in this category had 4 1/2 pages of material on this criteria). There are multiple rational reasons an evaluation committee member may have given a lower score, including the lack of detail in [Avertest's] policy.

*Avertest Appeals to the Board*

¶16   Less than a week after Officer issued the Protest Decision, Avertest appealed that decision to the Board. *See generally* Utah Code § 63G-6a-1602(1), (2). Avertest offered essentially the same grounds for error that it raised before Officer and also argued that Officer arbitrarily and capriciously or erroneously denied its protest.

¶17   In response to Avertest's appeal, the Board arranged for a three member panel to consider the appeal. The Board upheld the Protest Decision, directly addressing Avertest's arguments on the collection sites criteria and the overall contention that Avertest's proposal provided the best value. The Board rejected Avertest's claim that the evaluation committee "failed to conduct any due diligence into whether [the collection] sites meet the Scope of Work's requirements or DCFS's strict regulations as to collection sites" because such a requirement created an "unworkable and

unwieldy" standard for the committee. The Board also addressed Avertest's argument that its proposal provided the best value, noting that this was essentially an argument that Avertest should have received a higher technical score. The Board concluded that Avertest failed to demonstrate that the Protest Decision was arbitrary and capricious or clearly erroneous.

¶18    Avertest now seeks judicial review of the Board's decision.

ISSUE AND STANDARD OF REVIEW

¶19    The issue before us is whether the Board's affirmance of the Protest Decision rejecting Avertest's protest was arbitrary and capricious or clearly erroneous.

¶20    We "may not overturn a finding, dismissal, or decision" of the Board unless it "is arbitrary and capricious or clearly erroneous." *See* Utah Code § 63G-6a-1802(4)(c); *see also ICS Corr., Inc. v. Utah Procurement Policy Board*, 2022 UT 24, ¶ 15, 513 P.3d 677. An agency's decision is arbitrary and capricious if "it is not supported by substantial evidence in the record." *See Staker v. Town of Springdale*, 2020 UT App 174, ¶ 24, 481 P.3d 1044 (quotation simplified). And where this court perceives that "a reasonable mind could reach the same conclusion" as the administrative decision-maker after "consider[ing] all the evidence in the record, both favorable and contrary" to the decision, there is "substantial evidence in the record" to support the decision. *Id.* (quotation simplified). Similarly, we will not consider the Board's decision to be clearly erroneous unless it is against the clear weight of the evidence, or we are firmly convinced that a mistake has been made. *See JLPR LLC v. Utah Procurement Policy Board*, 2021 UT App 52, ¶ 15, 492 P.3d 784.

ANALYSIS

¶21 The Board both adequately addressed Avertest's arguments and there was a reasonable basis for the Board's decision. Because we determine that the Board's decision to uphold the Protest Decision was not arbitrary and capricious, we must affirm the Board's decision to uphold the Protest Decision.

### I. The Board Adequately Addressed Avertest's Arguments

¶22 Avertest argues that the Board failed to address Avertest's contentions—that the evaluation committee erred in scoring multiple criteria in Avertest's proposal—when the Board upheld the Protest Decision. Avertest asserts that this failure renders the Board's decision arbitrary and capricious. In its appeal to the Board, Avertest argued first that it should have received a higher score on multiple technical criteria, namely, (a) the collection sites criteria, because the evaluation committee should have done due diligence and investigated the feasibility of all thirty-two collection sites included in Beechtree's proposal; (b) the hours of operation criteria, because Avertest's proposal offered more morning and late evening hours for collection than Beechtree's proposal offered; (c) the qualified expert criteria, because Avertest has one more PhD on staff than Beechtree; and (d) the LGBTQ+ inclusive policy criteria, because Avertest "embraces the key principles of trauma-informed care." Second, Avertest argued that, had it received a score higher than the 51-point threshold and been included in the final cost proposal evaluation stage, Avertest would have been awarded the DCFS contract because it had the most cost effective proposal among those submitted to the evaluation committee.

¶23 The protest appeal decision issued by the Board was sparse and it certainly could have included more analysis. However, although there is no express adoption of the Protest Decision apparent in the Board's decision (which would certainly have

been preferable), we infer such an adoption here because (1) from the face of its order, the Board clearly reviewed the record, Avertest's arguments in its protest, and the Protest Decision and (2) after doing so, the Board expressly agreed with Officer's overall conclusion that there were "multiple rational reasons an evaluation committee member may have given [Avertest] a lower score." Through its implicit adoption of the Protest Decision, which thoroughly addressed each of Avertest's contentions, the Board adequately addressed Avertest's arguments.

## II. There Was a Reasonable Basis for the Board's Decision

¶24  As we have already acknowledged, we view the Board's decision as implicitly adopting the Protest Decision. And, as we will discuss in greater detail, the Protect Decision and the record before this court include substantial evidence that is adequate to convince a reasonable mind of the Board's decision. *See Utah Ass'n of Counties v. Tax Comm'n*, 895 P.2d 819, 821 (Utah 1995) ("Substantial evidence [is] that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion. . . . We defer to [a lower tribunal's] findings because, when reasonably conflicting views arise, it is the [fact-finder's] province to draw inferences and resolve these conflicts." (quotation simplified)).

¶25  To begin, the Board may "appoint a procurement appeals panel to conduct an administrative review of any claim in the appeal that has not been dismissed." Utah Code § 63G-6a-1702(5)(b)(ii)(B). Where a procurement appeals panel is convened, the panel "shall uphold the protest decision unless the protest decision is arbitrary and capricious or clearly erroneous." *Id.* § 63G-6a-1702(8)(b). This same standard applies at the appellate level of review. *See id.* § 63G-6a-1802(4)(c) ("The Utah Court of Appeals . . . may not overturn a finding, dismissal, or decision unless the finding, dismissal, or decision, is arbitrary and capricious or clearly erroneous.").

¶26 Avertest's burden before the Board was to overcome the deferential standard applied in these cases to demonstrate that the Protest Decision was unreasonable or against the clear weight of the evidence. Instead of demonstrating that its score *could* have been higher, Avertest needed to show that the Board's decision to uphold the Protest Decision was *unreasonable*—i.e., that *no reasonable person* could reach the same conclusion—or that a mistake had otherwise been made. *See ICS Corr., Inc. v. Utah Procurement Policy Board*, 2022 UT 24, ¶ 15, 513 P.3d 677; *Staker v. Town of Springdale*, 2020 UT App 174, ¶ 24, 481 P.3d 1044.

¶27 By comparing itself to Beechtree, Avertest has pursued the wrong path. To meet its burden of persuasion, Avertest needed to demonstrate that the Board's decision was unreasonable by showing how the evaluation committee members (1) abused their independent judgment, (2) failed to follow a provision of the RFP, or (3) incorrectly applied a scoring criteria. In its ruling, the Board made the point that there were "multiple rational reasons an evaluation committee member may have given a lower score" to Avertest. It was Avertest's burden to show why the lower score it received was incorrect or unreasonable, *not* why it should have received a higher score based on Avertest's own interpretation of the scoring provisions. As Avertest has failed to meet this burden, we decline to disturb the Board's decision affirming the Protest Decision.

¶28 Substantial evidence supports the Board's rejection of Avertest's protest:

- <u>Number of Collection Sites</u>. Beechtree proposed more collection sites—*ten more than Avertest*—so Avertest received a lower score on this criteria than Beechtree. In its protest, Avertest argued five reasons that Beechtree's proposed sites should have received a lower score, and Officer addressed each concern, finding them all to be unpersuasive. Officer pointed out that, even in the event

that Avertest's arguments had been persuasive, "[e]ach proposal is scored against the evaluation criteria, not against other proposals," and thus a change in Beechtree's score on this criteria would have "no bearing on [Avertest's] score and does not remedy [Avertest's] failure to achieve the minimum score threshold."

- <u>Hours of Operation</u>. Avertest received the same score as Beechtree on this criteria. While Beechtree offered more hours of operation because it had more sites, Avertest offered more early morning and late evening hours of operation. But these time windows were not automatically entitled to more weight than Beechtree's regular collection hours. Avertest identified three reasons why its proposed hours should have received a higher score, and Officer addressed each concern, finding them all to be unpersuasive. Officer went on to state that "[t]here are a multitude of rational reasons an evaluator might have scored [this criteria] the way they scored [it], including for example, lack of early morning hours at key sites, lack of late hours at key sites, and a limited number of sites."

- <u>Presence of Qualified Staff to Testify in Court</u>. Beechtree proposed more identified experts to testify about chain of custody and toxicology than Avertest—Avertest's proposal identified only two qualified staff members available to testify and did not list the qualifications of its area managers—so Avertest received a lower score on this criteria than Beechtree. In its protest, Avertest put forth a single reason why its proposed qualified staff available to testify in court should have received a higher score, and Officer addressed that reason and found the argument unpersuasive. Officer explained, "There are many reasons why an evaluator may have scored the way they scored [this criteria]. The lack of credentials for the area managers

alone would provide a rational basis for [the score Avertest received]."

- <u>LGBTQ+ Sample Collection Observation Policy</u>. Avertest scored higher than Beechtree on this criteria. In its protest, Avertest had only one argument for why it should have received a higher score on its LGBTQ+ policy. Officer, unpersuaded by Avertest's argument, stated in response that "[t]here are multiple rational reasons an evaluation committee member may have given a lower score [on this criteria], including the lack of detail in [Avertest's] policy," which was a mere "182 words" or half a page, compared to the highest scoring proposal, which included over four pages of rationale for this particular criteria. Avertest failed to provide evidence supporting its proposed policy, explaining what the policy entailed, or describing how such policy would be implemented.

¶29    Ultimately, Avertest failed to carry its burden to show that the Board's decision was arbitrary and capricious or erroneous.


CONCLUSION

¶30    We are not persuaded that the Board's decision to uphold the Protest Decision had no reasonable basis, nor do we believe that the decision was against the clear weight of the evidence. Accordingly, as the Board's decision to uphold the Protest Decision was not arbitrary and capricious or clearly erroneous, we decline to disturb the Board's decision.

———————